02-11-101-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00101-CV

 

 


 
 
 In the Interest of C.J. and L.J., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

 

          Appellant
C.E.J. (Father) appeals the termination of his parental rights to two of his
children.  After a bench trial, the trial court found by clear and convincing
evidence that Father had (1) engaged in conduct or knowingly placed the
children with persons who had engaged in conduct that endangered the physical
or emotional well-being of the children, (2) knowingly placed or knowingly
allowed the children to remain in conditions or surroundings that endangered
their physical or emotional well-being, and (3) knowingly engaged in criminal conduct
that resulted in his conviction of an offense and confinement or imprisonment
and inability to care for the children for not less than two years from the
date of filing the petition.[2]  The trial court also
found that termination of Father’s parental rights is in the children’s best
interest.  Father challenges the legal and factual sufficiency of the evidence
in four issues.  We affirm.

II.  Background

 

          Father
and B.K. are C.J. and L.J.’s biological parents.[3]  At the time of trial in
December 2010, C.J. was four years old, and L.J. was three years old.

          Investigator
Brandy Butler testified that the Department of Family and Protective Services (the
Department) received a referral in March 2009 alleging that Father’s oldest
son, who was fourteen at the time, was being left at home alone.[4]
 Butler spoke with B.K. and Father during her investigation of that incident.  B.K.
told Butler that Father was her former husband and the father of her two
youngest children.  B.K. also told Butler that Father was in jail at the time
after being arrested in Denton County for driving while intoxicated (DWI).  Father
told Butler that he was arrested on April 5, 2009, and that he had consumed
four beers and a Bloody Mary the day of his arrest.

          The
trial court admitted an exhibit reflecting that Father had entered an open plea
of guilty to the April 2009 DWI charge and that Father had been sentenced to
twenty-five years’ confinement.  The trial court also admitted several exhibits
relating to Father’s prior criminal record.  Included are two prior convictions
for misdemeanor DWI and three prior convictions for possession of marijuana.  Butler
testified that Father had also told her that he was paroled in 1994 for a
burglary of a habitation conviction.

          Father
admitted to Butler that he had used marijuana in the past.  Butler asked that
Father take a drug test, but Father refused.  Butler referred Father for a drug
and alcohol assessment, but Butler never received confirmation that Father had
submitted to the assessment.  Butler testified that Father denied having a
drinking problem.

          Jeremy
Dickinson is also a Department investigator.  He was assigned an investigation
relating to C.J. and L.J. on August 20, 2009.  Dickinson testified that the
Department was contacted because of a drug bust at a house in North Richland
Hills, Texas, where C.J. and L.J. were living with B.K.  According to
Dickinson, both B.K. and her father, T.G., were involved in a drug ring, and
the house was being used “as the safe house for this crime ring.”[5]
 The resulting federal information against B.K. alleged that she had, among
other things, “intentionally and knowingly open[ed], maintain[ed], and us[ed] a
place . . . for the purpose of distributing . . . methamphetamine.”  B.K. later
pleaded guilty in federal court to “maintaining drug involved premises” and
“structuring transactions to evade reporting requirements,” and she was
sentenced to consecutive sentences totaling more than eighteen years.

          Dickinson
testified that he went to B.K.’s house in North Richland Hills on the day of
the drug bust.  When he arrived, B.K. was handcuffed and in custody.  There
were ten to twenty law enforcement personnel, including federal and city
officers, present at the home, and some of the officers were wearing full-body
armor and helmets and carrying automatic weapons.

          Dickinson
testified that B.K. appeared to be under the influence of a narcotic when he
saw her at the house.  “She was very agitated, her pupils were dilated; she
also had multiple scratches and sores on her head, neck, and face that are very
common with heavy methamphetamine users.”  B.K. admitted to Dickinson that she
had smoked marijuana and had used pain pills a few days earlier.  B.K. told
Dickinson that C.J. and L.J. were present in the home while the police
conducted the raid, which he described as a scary scenario for the children.  He
testified that it is not safe for children to live in a drug house because they
could be exposed to violence and because they might have access to drugs and
ingest them, causing serious health injuries or death.

          Dickinson
also saw the children at the home.  He testified that they appeared to have
been fed and well cared for.  He did not observe any signs that the children
had been abused or neglected.

          Dickinson
interviewed Father on August 24, 2009,[6] and Father said that he
knew the children lived with B.K. and that he had seen signs of drug use in
B.K.’s appearance, specifically scratches and sores, as early as February 2008.
 Father also told Dickinson that B.K. had allowed him less and less contact
with the children after February 2008.

          Father
told Dickinson that he had discussed his lack of contact with the children with
T.G., but he also said that T.G.’s “associates . . . in no uncertain terms
basically told him that he needs to back away because his life and his
14-year-old son’s life were in danger if he continue[d] to pursue this.”  Father
acknowledged to Dickinson that he did not seek custody of the children or
contact law enforcement or the Department after learning of the circumstances
in which they were living with B.K. and T.G., and he cited the threat by T.G.’s
associates as the reason for not doing so.  On cross-examination, Dickinson
testified that he believed that Father was genuinely afraid to pursue further contact
with his children.

          Dickinson
testified that Father acknowledged his pending April 2009 DWI charge and that
Father admitted past marijuana and methamphetamine use.  After the children had
been removed and were in Department custody, Dickinson asked that Father take a
hair follicle drug test, but Father refused.  Dickinson acknowledged that
Father’s refusal could have been on the advice of counsel.

          Carressa
Cherry served as a Department caseworker for this case.  She testified that
Father’s decision to not take action to remove his children from the dangerous
situation with B.K. demonstrated poor parenting skills.  She also testified
that Father and B.K. cannot provide the children with stable housing because
they will be in prison for twenty-five and eighteen years, respectively.  Cherry
said that Father and B.K. have not demonstrated that they can meet the
children’s emotional and physical needs because they are not able to contact or
parent the children while they are incarcerated and because they are unable to
provide for the children financially.  Cherry also pointed to B.K.’s exposing
the children to danger by putting them into an environment that involved drug
use and people with histories of violent crimes.  She testified that Father has
a history of poor decision-making that included three DWI convictions and other
criminal charges in addition to not intervening for his children when they
lived with B.K.

          Cherry
testified that it is in the children’s best interest if Father’s and B.K.’s
parental rights are terminated and that the Department intends to make the
children available for adoption.  She also testified that because of his other
criminal history and refusal to take drug tests, her best interest opinion
would not change if Father were released from incarceration.  Cherry said that
Father’s DWI convictions, even though the children were not with him, revealed
a concerning pattern of behavior.  Also, although B.K. was directly responsible
for the children living in a dangerous home environment, Father had a
responsibility to take steps to protect them.  Cherry testified that Father
could have contacted the Department, an attorney, or law enforcement to report
that he believed there was drug activity in the home.

          Cherry
also testified that Father had not completed counseling or parenting classes.[7]
 However, she acknowledged that her opinions would not change even if he had
completed those services because of his lengthy prison sentence.  Father had already
been arrested for the 2009 DWI offense when this case started, and it was
resolved in the summer of 2010.  Cherry also testified that she could not
speculate on what might occur if Father’s most recent DWI conviction were
reversed on appeal.

          Cherry
testified that the children are in foster care.  The foster parents have a
biological daughter, and Cherry had witnessed the children’s interaction with
the foster family and described their relationship with the children as
positive.  Cherry was asked to describe how C.J. and L.J. were doing at the
time of trial, and she testified,

          They’re
doing very well.  Their behavior overall is good.  They participate in a
pre-school program several days a week to assist with learning and socialization.

 

          [L.J.] was
having problems with her speech, but that’s actually greatly improved over the
last several months.

 

          Both of the
children are very sweet and loving kids, always wanting to give hugs and
interactive play.  They’re up-to-date on all their medical and dental exams,
and there are no health concerns at this time, and they are seeing a play
therapist once a week.

          Cherry
said that the children do not have any identified, special needs at present.  She
testified that they are involved with play therapy to help them with the
transition into foster care and that the children, who were initially placed
with relatives, had a hard time when they first arrived in foster care.

          Cherry
testified that neither Father nor B.K. had provided the Department with the
names of any appropriate caregivers with whom the children could be placed.  However,
Cherry also testified that the Department was in the process of completing a
home study of B.K.’s cousin, D.O., who resides in Maryland.  That process was
not complete at the time of trial because of information required by the State
of Maryland to complete the home study, but Cherry testified that D.O. seemed
to be an appropriate placement for the children based on information currently
known to her.  Cherry also testified that B.K. had written her a letter stating
her desire for the children to be adopted by D.O.

          Cherry
testified that the children’s current foster family would also like to adopt
the children if they are not adopted by D.O. and that the current foster family
would be a good, long-term placement for the children.  Cherry testified that,
regardless of who might adopt the children, the adoptive family would be
eligible to receive through the Department a monthly adoption assistance
payment, Medicaid health coverage, adoption-expense reimbursements, counseling,
state-college tuition in Texas for the children, and other post-adoption
services.

          Allen
Palmer served as the children’s court-appointed special advocate (CASA).  He
recommended termination of Father’s parental rights because of the lengthy
prison sentence for Father’s most recent DWI conviction.  But Palmer also
testified that he would not recommend termination if Father had instead
received probation or a short prison sentence with a possibility of parole within
a year or two.

          Palmer
said that Ruth Groomer, the initial caseworker, was “less than helpful,” that
she did not treat Father in a fair way so that he could complete his services,
and that the Department file reflected that Father had taken no action toward
his service plan and was not responding to Groomer’s attempts to contact him.  Palmer
testified that, to the contrary, Father went “above and beyond” in trying to
complete his service plan before he was incarcerated.  He was working, was
trying to take care of the children, and had rented an apartment and arranged
for a larger place if he was given custody of the children.  Father’s efforts,
however, necessarily stopped when he was incarcerated.

          Palmer
visited C.J. and L.J. at their current foster home, and he testified that they
seem well-adjusted and happy there.  The children have responded well to the
structure in the current foster home, and the behavioral issues they exhibited
in the past “are being dealt with expediently and very nicely” in the current
home.  Palmer said that the children are “very smiling and happy,” and he
testified that he does not have any concern that the current foster home would
be an appropriate, long-term placement for the children.

          Groomer
testified that she served as the Department caseworker beginning August 26,
2009, and ending in August 2010.  She first met with Father at the show cause
hearing in September 2009.  She interviewed B.K. at the Parker County Jail in
October 2009.  Mother told her that Father had abandoned her, the children, and
Father’s oldest son without money for food or electricity.  Groomer agreed that
she could not verify Mother’s statement but testified that Mother’s body
language suggested that she was telling the truth.  Mother was very upset and
said that Father’s leaving was the reason she started selling drugs.

          Groomer
testified that the children were not placed with Father following their removal
from B.K. because of the pending felony DWI case against him, not because B.K.
had said he abandoned her and the children.  She testified that her supervisor,
following Department policy, made the decision to decline placement with
Father, but she also said that Father, depending on the outcome of his criminal
charges, was not permanently disqualified from future placement.

          Groomer
testified that Father did not complete his service plan.  To her recollection,
Father submitted to a drug and alcohol evaluation and a psychological
assessment.  She said that Father did not attend counseling or parenting classes
and that he never provided proof that he had a job or stable housing.  Groomer
testified that Father would not tell her when she could visit his home, even
though she volunteered to go there on a weekend.

          Groomer
testified that Father falsified information during his psychological assessment
and that he was found in his drug and alcohol evaluation to have addictions and
was referred to Alcoholics Anonymous (AA).  Groomer testified that Father never
provided her with sign-in sheets from his AA meetings, and she said he did not
show up for his counseling appointment with Catholic Charities.

          Groomer
said Father asked her “[m]aybe two or three times” for the referral forms for
his service plan, but she testified that she had already sent them by e-mail or
fax and denied that the service providers did not receive the referral forms.  She
testified that she would follow up with service providers to confirm whether
the parent had set up an appointment or had been participating in services and
that those confirmations are reflected in her case notes.  Groomer
acknowledged, however, that caseworkers have too many cases and try to do what
is best for the children and that the “paperwork comes last.”  Groomer denied
having previously seen several exhibits concerning Father’s work toward his
service plan, including a progress report and certificate of completion from
MHMR of Tarrant County, Father’s AA attendance record, Father’s 1099 forms, and
a certificate of completion for a parenting class Father took on his own
accord.[8]  Groomer testified that
she could not know whether Father was completing his service plan if he did not
provide her with documentation to confirm his efforts.

          Groomer
testified that Father’s parental rights should be terminated because he has a
criminal history that began twenty-three years earlier.  Specifically,
termination was necessary because his most recent conviction was felony DWI.  Had
the felony offense been dropped, and had he completed his service plan, the
Department’s plan would have remained family reunification.

          Father
testified that he has a fifth grade education and does not have a GED.  When
the children were removed, Father had a construction and roofing job, the type
of job he had always worked.  He testified that, in the past, he had been a
“storm-chaser,” meaning that he traveled to areas where there had been
tornadoes or hail storms and helped people rebuild their homes.  Father denied
leaving B.K. and the children without money for food or utilities.

          Concerning
his April 2009 DWI arrest, Father admitted drinking six beers at a NASCAR race,
having a blood-alcohol level of .08, and being legally intoxicated.  He
testified, however, that he has not “touched a drop since,” that he is current
on all of his AA and NA meetings, and that he has taken parenting classes.  Father
asked that the court not terminate his parental rights and place the children
with family so that he would not lose his chance to see the children grow up
and be a part of their lives.

          Father
testified that he worked his service plan to the best of his ability.  He
attended every visitation, was never late, paid child support, and gave the
children clothes and toys.  Father testified that Groomer prevented him from
taking pictures of the children[9] and that it took her six
months to give him the forms necessary to work his service plan.  He said that
he passed a drug test shortly after this case started and that he last used
drugs, specifically marijuana, in December 2007.  Father admitted refusing a
drug test during this case, but he testified that he did so on the advice of
his criminal lawyer.  Father also admitted using methamphetamine in the past
but said that it was more than twenty years earlier.

          Father
testified that he did not know where the children were living before they were
removed by the Department; he only knew that they were living with T.G. and
B.K.  He testified that, as time passed, B.K. allowed him less and less contact
with the children because she was abusing drugs and did not want him to know.  Father
said that his first thought when he learned in April 2008 of B.K.’s drug
problem was to get her help but that she did not want his help.  Father
testified that he talked to B.K. and asked her if he could speak with T.G.  When
Father arrived at T.G.’s house, T.G. was not there, but one of T.G.’s
associates took Father to the garage where plastic sheets covered the entire
floor.  Father testified that “it was something out of a movie, you would
think” and that it scared him.  Father also described what T.G.’s associate
said to him:

          He told me
that, [Father], I like you, but if [T.G.] says I’ve got to kill you, I’ve got
to kill you.  You and your son will disappear.  I’m going to tell you how I’m
going to do it.  We’ll come over in the middle of the night and kick your front
door open and you will disappear and nobody will ever see you again.

          Father
testified that he was told that T.G. “had cops and judges on the payroll,” that
he knew that T.G. had a “previous conviction [for] a chopped-up body in his
trunk where he done 10 years in prison,” and that he did not feel he had a
choice about taking action to get the children away from T.G. and B.K.  On
cross-examination, however, Father agreed that when their children are
involved, parents must rise above threats to their personal safety to protect
their children, and he expressed regret for not having done so.

          Father
testified that he was incarcerated on June 15, 2010.  The April 2009 DWI was
his third DWI, and although his attorney led him to believe that he was
eligible for probation, he later learned that he faced a minimum sentence of
twenty-five years because of his two prior DWI convictions and his other
criminal convictions.  Father also testified that, three or four days before
his criminal disposition hearing, he saw a white, powdery substance (which he
believed to be cocaine from his past drug experience) on a small mirror on his
attorney’s desk.  He could not fire his attorney, though, because he had paid
him $10,000 and had only a few days before his final hearing.  Father testified
that he believed he had paid his attorney to have a jury trial but that his
attorney instead arranged for an open plea of guilty.  Father said that he did
not tell the judge about his lawyer using drugs because he was scared that the
judge would not believe him and was afraid that he would not have any legal
representation.  Father testified that the judge sentenced him to the minimum
possible sentence, but the sentence was still twenty-five years.  Father also
testified that he had recently learned that the court of criminal appeals had
granted him the right to file an out-of-time appeal.  Father said that if he
were granted a new trial and could somehow get probation, he wants to continue
working to get the children back.[10]

          Father
testified that the children’s potential placement in Maryland would be good
because D.O. is part of the family and that he would want the children with
family if his current fiancée was not an available placement option.  Father
also said that his mother, who has custody of his now-sixteen-year-old son,
would be an appropriate placement.

III. 
Standards of Review

          A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629 (Tex.
App.—Fort Worth 2000, pet. denied) (op. on reh’g).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

          In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated subsection (D), (E), or (Q) of section 161.001(1) and
that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89
S.W.3d at 28.  If, in light of the entire record, the disputed evidence
that a reasonable factfinder could not have credited in favor of the finding is
so significant that a factfinder could not reasonably have formed a firm belief
or conviction in the truth of its finding, then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

IV. 
Statutory Endangerment

          Father
argues in his first three issues that the evidence is legally and factually
insufficient to support the trial court’s section 161.001(1)(D), (E), and (Q)
findings.

A.  Former
Family Code Section 263.405(i)

          The
Department argues that we need not consider Father’s first three issues because
he failed to include his third issue—the challenge to the trial court’s section
161.001(1)(Q) finding—in his statement of points for appeal and because the
unchallenged finding negates our need to review the section 161.001(1)(D) and
(E) findings because it independently supports the trial court’s judgment.[11]
 We overrule the Department’s argument for the reasons stated in this court’s
prior opinions in In re A.J.M., No. 02-11-00137-CV, 2012 WL 2877457, at
*1 (Tex. App.—Fort Worth July 16, 2012, no pet. h.) (op. on reh’g) (en banc),
and In re D.W., 249 S.W.3d 625, 645 (Tex. App.—Fort Worth) (en banc), pet.
denied, 260 S.W.3d 462 (Tex. 2008) (per curiam).

B.  Discussion

Family
code section 161.001(1)(Q) states:

          The court
may order termination of the parent-child relationship if the court finds by
clear and convincing evidence:

 

(1)  that the parent
has:

 

(Q) knowingly engaged
in criminal conduct that has resulted in the parent’s:

 

(i) conviction of an
offense; and

 

(ii) confinement or
imprisonment and inability to care for the child for not less than two years
from the date of filing the petition.

Tex.
Fam. Code Ann. § 161.001(1)(Q).

          Father
argues that the evidence is legally and factually insufficient to support
termination under section 161.001(1)(Q) because the conviction for which he is
currently serving a twenty-five year sentence is “riddled with problems,” and
he points to the evidence concerning his attorney’s alleged inadequate
representation and drug use, his own alleged failure to knowingly plead guilty,
and his pending appeal.  However, the trial court could have, in its role as
the sole judge of the credibility of the witnesses and the weight to be given
to their testimony, disbelieved Father’s testimony about his attorney’s
representation and drug use.  See In re C.S.L.E.H., No. 02-10-00475-CV,
2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem.
op.); see also In re T.N., 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo
2005, no pet.) (“[T]he fact finder, as opposed to the reviewing body, enjoys
the right to resolve credibility issues and conflicts within the evidence.  It
may freely choose to believe all, part, or none of the testimony espoused by
any particular witness.”).  Moreover, by contending that he did not knowingly
plead guilty, Father misapplies the wording of section 161.001(1)(Q).  The
statute requires that Father knowingly engage in criminal activity that results
in conviction, confinement, and an inability to care for his children for at
least two years following the date of the Department’s original petition, not
that Father knowingly agreed to plead guilty or receive a certain sentence of
imprisonment.  See Tex. Fam. Code Ann. § 161.001(1)(Q); see also In
re A.V., 113 S.W.3d 355, 360 (Tex. 2003) (holding two years in section
161.001(1)(Q) is measured prospectively).

          Father
also argues that there is no evidence that he knowingly committed the April
2009 DWI because he did not testify about his intent or mental state.  But
there is evidence from which the trial court could have found by clear and
convincing evidence that Father knowingly engaged in criminal conduct.  For
example, Father had two prior DWI convictions and was required to have a device
in his car to prevent him from driving while intoxicated.  Further, Father
testified that he drank six beers at a NASCAR race on the day of his April 2009
arrest.  The trial court could have determined that Father knowingly engaged in
criminal conduct by driving his vehicle after drinking six beers at the race.  See
generally Tex. Penal Code Ann. § 6.03(b) (West 2011) (providing that a “person
acts knowingly . . . with respect to the nature of his conduct . . . when he is
aware of the nature of his conduct . . . .  A person acts knowingly . . . with
respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.”).

          The
evidence also satisfies the remainder of the statutory requirements.  Father
was convicted of the April 2009 DWI and sentenced to twenty-five years’
confinement.  Cherry testified that Father had no contact with the children
from prison and that he could not provide for the children from prison.  Thus,
there is evidence that Father was convicted of a criminal offense, that he
would be imprisoned or confined for at least two years, and that he would be
unable to care for the children for at least two years. See Tex. Fam.
Code Ann. § 161.001(1)(Q); In re B.M.R., 84 S.W.3d 814, 817–19
(Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding legally and factually
sufficient evidence supported termination under section 161.001(1)(Q)).

          Applying
the appropriate standards of review, we hold that the evidence is legally and
factually sufficient to support termination of Father’s parental rights under
section 161.001(1)(Q).  See J.P.B., 180 S.W.3d at 573; see also H.R.M.,
209 S.W.3d at 108.  We overrule Father’s third issue.[12]

V. 
Best Interest

          Father
argues in his fourth issue that the evidence is factually insufficient to
support the trial court’s best interest finding.

A. 
Applicable Law

          There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may use
in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted). 
These factors are not exhaustive; some listed factors may be inapplicable to
some cases; other factors not on the list may also be considered when
appropriate.  C.H., 89 S.W.3d at 27.  Furthermore, undisputed evidence
of just one factor may be sufficient in a particular case to support a finding
that termination is in the best interest of the child.  Id.  On the
other hand, the presence of scant evidence relevant to each factor will not
support such a finding.  Id.

B. 
Discussion

          Father
acknowledges his current incarceration but argues that the evidence is
factually insufficient to support the trial court’s best interest finding
because the evidence demonstrates that he is “a loving father who has the
capacity to raise children in a safe environment.”  Father also acknowledges
his past criminal convictions, but he argues that he did not personally
endanger the children, that the children lived with B.K. when they were
removed, and that he does not pose a future danger to the children.  He also
points to evidence that he interacted appropriately with the children, attended
all of the visitations, took clothes and toys to the children, worked
diligently on his service plan, and demonstrated an ability to maintain stable
employment and housing prior to his incarceration.  Father also points out that
he had custody of his teenage son and that there was no evidence that his
parenting skills were detrimental to the children.  Finally, Father argues that
his actions are excusable because his life was threatened by T.G.’s associates
and because he allegedly received ineffective assistance of counsel for his
most recent DWI conviction.

          Father’s
arguments highlight the evidence favorable to his position, but the trial court
also heard other evidence concerning the children’s best interest.  The
children were removed from B.K.’s custody following a drug bust at the home in
which the children were living.  The children were present during the drug
bust.  Father knew that the children were living in dangerous conditions but
never contacted the Department or any law enforcement agency in an effort to
protect the children from danger.  Mother was sentenced to eighteen years’
confinement for her role in the drug trafficking operation, and Father was
sentenced to twenty-five years’ confinement for his third DWI conviction.  Father
also has three prior convictions for possession of marijuana and a conviction
for burglary of a habitation.  Neither of the parents can provide support to
the children while they are incarcerated.

          The
children had some difficulties when they were first placed into foster care,
but they have both participated in play therapy and are doing quite well now.  The
Department is in the process of approving placement for the children with D.O.,
a family member who resides in Maryland, and Cherry testified that she was not
aware of any reasons that D.O. would not be approved for placement.  D.O. wants
to adopt the children, and Mother and Father each expressed that they approve
of a placement with D.O.  If the children are not adopted by D.O., their
current foster family would like to adopt them.  Witnesses testified that
either D.O. or the current foster family would be appropriate environments for
the children.  Regardless of who adopts the children, the adoptive family will
have numerous resources available to them for assistance, and the children will
be eligible to receive tuition to attend a Texas public university.

          The
trial court stated at the conclusion of the trial that it was “fairly obvious”
that Father loved the children but that it was required to make a determination
of what is in the children’s best interest.  Applying the appropriate standard
of review, we hold that factually sufficient evidence supports the trial
court’s finding that termination of Father’s parental rights is in the
children’s best interest.  See H.R.M., 209 S.W.3d at 108.  We overrule
Father’s fourth issue.

VI. 
Conclusion

          Having
overruled each of Father’s dispositive issues, we affirm the trial court’s
judgment.

 

 

ANNE GARDNER

JUSTICE

 

PANEL: 
DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DAUPHINOT, J. concurs
without opinion.

WALKER, J. filed a
concurring opinion.

DELIVERED:  August 2, 2012

 


 
 
 
 
 
 


 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00101-CV

 

 


 
 
 In the Interest of C.J. and L.J., Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

CONCURRING
MEMORANDUM OPINION[13]

----------

          Although
I did not agree with the reasoning of the en banc opinion of the majority in In
re A.J.M., No. 02-11-00137-CV, 2012 WL 2877457, at *1 (Tex. App.—Fort Worth
July 16, 2012, no pet. h.) (op. on reh’g) (en banc), that opinion is
nonetheless binding precedent in this appeal.  Therefore, I respectfully concur
with the majority opinion in this appeal.  See generally Ross v. Union
Carbide Corp., 296 S.W.3d 206, 221 (Tex. App.—Houston [14th Dist.] 2009,
pet. denied) (en banc) (Frost, J., concurring) (stating that “‘absent (1) a
decision from a higher court or this court sitting en banc that is on point and
contrary to the prior panel decision or (2) an intervening and material change
in the statutory law, this court is bound by the prior holding of another panel
of this court’”).

 

 

SUE WALKER
JUSTICE 

 

 

DELIVERED:  August 2, 2012

 









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Fam. Code
Ann. § 161.001(1)(D), (E), (Q) (West Supp. 2012).





[3]The trial court also
terminated B.K.’s parental rights, but B.K. is not a party to this appeal.





[4]The March 2009 referral
was ruled “unable to determine” after the Department learned that the child,
who is not involved in this appeal, had been left in his grandmother’s care
while Father traveled for work.





[5]Dickinson testified that
T.G. was the leader of a large methamphetamine trafficking ring.





[6]B.K. initially told Dickinson
that Father was homeless, that he lived out of his car, and that she did not
have Father’s contact information, so Dickinson did not speak with Father until
the day of the show cause hearing.





[7]Cherry agreed that six
months is an unreasonable time for the Department to wait before sending referrals
for Father’s services if that is what occurred in this case.





[8]Groomer acknowledged,
however, that if Father took and completed an independent class that covered
the same topics required by the service plan, the Department would allow the
independent class to count toward completion of the service plan.





[9]Groomer denied this and
testified that she was not present at that visit.





[10]Father’s criminal appeal
was decided after the trial court signed the order terminating Father’s
parental rights, but we note that this court affirmed Father’s DWI conviction
in November 2011.  We do not include the citation to that opinion in order to
protect Father’s and the children’s identities.  See generally Tex. R.
App. P. 9.8.





[11]The Department does not
argue that Father waived his challenge to the trial court’s best interest
finding.





[12]Along with a best
interest finding, a finding of only one ground alleged under section 161.001(1)
is sufficient to support a judgment of termination.  In re E.M.N., 221
S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).  We thus need not address
Father’s first and second issues.  See id.; see also Tex. R. App.
P. 47.1, 47.4.





[13]See Tex. R. App.
P. 47.4.